## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## SAN ANGELO DIVISION

JAVARE LEE SMITH,                        §
Prison ID # 66864,                       §
                                         §
                  Plaintiff,             §
                                         §
v.                                       §          Civil No. 6:17-CV-0055-BL
                                         §
TOM GREEN COUNTY JAIL, et al.,           §
                                         §
                  Defendants.            §

### MEMORANDUM OPINION AND ORDER

Pursuant to 42 U. S. C. § 1983, Plaintiff sues Tom Green County Jail ("the Jail") and Nurse Sharron[1] for alleged denials of adequate medical care and harassment with homosexual discrimination. *See* Compl. (doc. 1) at 3. The Court has granted Plaintiff permission to proceed with this case *in forma pauperis*. *See* PLRA Filing Fee Order (doc. 5). On November 30, 2017, the District Judge referred the case to the undersigned. *See* Order (doc. 6). Plaintiff thereafter consented to have a United States Magistrate Judge conduct any and all further proceedings in this case, including entry of a final judgment, in accordance with 28 U.S.C. § 636(c). *See* Consent to Proceed Before a United States Magistrate Judge (doc. 8).

Pursuant to *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985), the Court set the matter for an evidentiary hearing and ordered the Jail to provide authenticated copies of relevant institutional records. *See* Order Setting Evid. H'rg (doc. 7). The Jail provided relevant records,[2] Plaintiff filed

---

[1] Jail records show that a nurse by the name of Sharon Epperson signed a medical diet order on October 22, 2017. *See* R. 276. Plaintiff uses "Sharron" and does not know her last name, but he has stated that she worked at Tom Green County Jail through Shannon Medical Center and "everything goes through her." In general, the Court will refer to this defendant as "the Nurse" or "Nurse Sharon" for ease of reference.

[2] The 752-page administrative record contains many documents that are immaterial to this action. Documents submitted to the Court should be relevant to the issues in this case or provide context or relevant background information.

a time-line of events (doc. 9), and on January 31, 2018, the Court conducted a hearing to clarify factual allegations in the complaint. At that hearing, Plaintiff verified that the events he sets out in the time-line are true and correct with approximate dates. He also stated that he was in the Jail during the relevant period as a pretrial detainee and that the Jail had different staff when he was previously housed there. Following the *Spears* hearing, Plaintiff filed a document that has been docketed as a motion to add two new defendants (doc. 11).

After considering Plaintiff's complaint, his answers at the *Spears* hearing, supplemental filings, the authenticated jail records, and the applicable law, the Court issues this Memorandum Opinion and Order finding that Plaintiff has stated no claim that survives summary dismissal and thus dismisses this action in its entirety. It also denies the motion to add defendants.

## I.    BACKGROUND[3]

Plaintiff has been in and out of Tom Green County Jail multiple times over the years. His most recent prior detention at the Tom Green County Jail ended on December 4, 2015. *See* R. 300. During his prior detentions he had noted medical issues with gout, was prescribed medication, and was placed on a medical diet. His current detention at the Jail commenced in July 2017. R. 310-16. His current detention continues but was interrupted by a transfer to Nolan County Jail as discussed more fully later. Although Plaintiff limits this case to a specific portion of his current detention, additional medical history provides pertinent context for this case.

On October 7, 2014, Nurse Practitioner Susan Schultz ("Schultz") ordered a diet that elimin-

---

[3]The factual background is taken from Plaintiff's complaint, his supplemental filings, answers provided at the *Spears* hearing, and the authenticated jail records. When screening for failure to state a claim, the Court views Plaintiff's factual allegations in accordance with *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). *See Samford v. Dretke*, 562 F.3d 674, 678 (5th Cir. 2009).

ated beef and beans and increased vegetables and fruit, particularly apples.[4] R. 397. Later that month, medical ordered a regular meal tray because Plaintiff had refused the diet tray. R. 433. In December of that year, Plaintiff claimed he had not refused his diet tray and requested "to be placed back on [his] diet tray (Gout/No beans/No beef) due to severe flare-ups of gout." R. 751.

On May 8, 2015, Plaintiff requested medical to resume his gout medications "from previous jailing." R. 398. Schultz noted a gout history that had been managed with medication and diet during prior incarceration. *Id.* At that time, Plaintiff had not taken Allopurinol "for a few years." *Id.* Plaintiff was not having a gout "flare" and Schultz prescribed Ibuprofen 800 mg and the diet previously ordered on October 7, 2014. *See id.* On June 3, 2015, however, Plaintiff signed a Medical Treatment Refusal Form in which he again refused a diet tray, stated that the refusal was voluntary, and he would not pursue litigation as a result of his refusal. R. 390. The next day, he submitted a Non-emergency Request Form to inform medical that he "no longer want[ed]" his diet tray. R. 392. Schultz noted that medical discontinued the diet tray on June 8, 2015. R. 386. Later that month, Plaintiff submitted another Non-emergency Request Form to report that he was having a gout flare-up and needed his uric acid levels checked so that he could get medication. R. 387.

A gout attack compelled Plaintiff to see medical on July 1, 2015. R. 386. At that time, he reported that it had been five years since his last gout attack. *Id.* The record notes that he had been on "a no meat, no beans, extra fruit diet" but reported problems getting correct diet. *Id.* The medical record also states that medication, including Allopurinol, had worked in past. *Id.* Ibuprofen was not helping, but Plaintiff was able to walk and wear shoes. R. 384. Medical assessed a gout flare-up and

---

[4]The October 2014 record identifies this nurse as "S Schultz RW FNP-C," but the medical record as a whole shows her full name as Susan Schultz.

morbid obesity and prescribed Colchicine and Indocin (a.k.a. Indomethacin). *Id.* Schultz noted that staff had "resubmitted special diet." *Id.* The resubmitted diet again eliminated beef and beans while increasing fruits and vegetables. R. 389.

A medical note dated July 6, 2015, shows that nursing staff had reported resolution of the acute gout attack. *Id.* Medical changed his medication to Allopurinol 100 mg for ninety days. *Id.* A lab report from Shannon Medical Center dated that same date shows an elevated uric acid level. R. 385. Schultz referred Plaintiff for additional lab work on August 11, 2015. R. 383. Records from October 2015 show a history of gout, a then current prescription for Indomethacin 50 mg, and a renewal of that prescription for thirty more days by Schultz. *Id.* After a "gout flare up" in November 2015, the records indicate that Plaintiff intended to request further treatment, but three days later, he instead refused treatment. *Id.* Plaintiff was released from Tom Green County Jail in December 2015. R. 300.

Plaintiff returned to the Jail after his arrest on July 17, 2017. R. 310-16. At booking, he reported foot and back trouble with swollen or painful joints. R. 312. He also reported that he was not "in current need of medical attention." R. 319. Nevertheless, on that date, he requested gout medication. *See* R. 306, 308. Two days later, Schultz and "KB"[5] examined Plaintiff; noted a "long [history] of gout which has been managed" with medications, including Allopurinol; and prescribed Allopurinol 100 mg and Ibuprofen 800 mg for 180 days along with releasing him from work for two days. R. 300.

Jail medication charts show that Schultz authorized Plaintiff to start Ibuprofen 800 mg twice daily on July 19, 2017, with a scheduled stop date of October 16, 2017. R. 321, 324. She authorized

---

[5] The name is illegible but first name starts with a "K" and last name starts with a "B."

him to start Allopurinol 100 mg once daily on July 21, 2017, with a scheduled stop date of January 15, 2018, but the Jail discontinued the prescription on October 3, 2017. *Id.* These charts[6] list Plaintiff as absent, missing, or a "no show" for Ibuprofen the mornings of July 22 and 28 and August 4, 8, 12, 14-15, 17, 19, and 21-25 and evening of July 29. *Id.* They list him as missing or a "no show" for Allopurinol on July 22 and 28 and August 12, 14, 15, 17, 19, and 21-24. *Id.* They list him as refusing Ibuprofen both morning and evening on July 30 and just the mornings of August 7 and 13. *Id.* They list him as refusing Allopurinol on each of those same dates. *Id.* The Jail lists Plaintiff as non-compliant with medication for those dates. R. 323, 326.

On July 30, 2017, Plaintiff asked if a diet tray had been started yet. R. 299. He completed a Non-emergency Request Form on August 7, 2017, to discuss a diet tray. R. 301. Medical received the form the next day and met with him the day after. R. 300-01. Plaintiff requested a "no beans" gout diet and "C Dickinson"[7] and KB noted that an order had been faxed to the kitchen. R. 300. KB completed a Medical Diet Order for a "no beans" diet to start August 9, 2017, and to end with Plaintiff's release. R. 303-04. A Fax Confirmation shows that KB sent the order early in the afternoon on August 9, 2017. R. 303.

According to medication charts, Plaintiff was out of county on August 25 and August 30 through October 2, 2017. R. 326, 329-32,[8] 336. It is also apparent that he was not housed in Tom

---

[6]The record as a whole shows that Plaintiff was not housed in the Tom Green County Jail from the afternoon of August 25 through October 2, 2017. Accordingly, the Court disregards references in the Jail medication charts that Plaintiff was absent, missing, a "no show," or otherwise suggests that Plaintiff was housed there during that time.

[7]Although medical records show a C. Dickinson, a Chris Dickinson, a James C. Dickinson, and a James Christopher Dickinson, *see* R. 285, 300, 333, 337, there is no basis in the record to believe that more than one Dickinson worked at Tom Green County Jail during the relevant time period. Accordingly, the Court will generically identify this individual as "Dickinson."

[8]Some dates in September are not listed as out of county, but the record as a whole supports finding that Plaintiff was not in Tom Green County Jail in September 2017.

Green County Jail August 26 through 29. Cell assignment documentation indicates that he was housed in Nolan County Jail from August 25, 2017, to October 2, 2017. R. 59-60. An Offender Log Report showing each time an inmate is checked in his cell shows that he was not in Tom Green County Jail starting the afternoon of August 25, 2017, through October 2, 2017. *See* R. 95-96. The Jail's Inmate Balance History Report details inmate purchases and also shows that he was released from the Jail on August 25 and returned on October 3, 2017. *See* R. 354.

A medical record dated October 2, 2017, shows gout as a medical issue and that Plaintiff was currently prescribed Allopurinol 300 mg. R. 298. Medical progress notes dated the next day show a prescription for Allopurinol 300 mg authorized by Dickinson and "S Epperson." R. 285. Upon his return to Tom Green County Jail, Plaintiff (1) resumed his Ibuprofen prescription through October 16, 2017, as previously authorized by Schultz, but was listed as a "no show" for the mornings of October 4, 9, and 12; (2) started a new prescription authorized by Dickinson for Ibuprofen on October 18, 2017, with an end date of November 17, 2017, but was listed as a "no show" for the mornings of October 20 and 24; and (3) started a prescription authorized by Dickinson for Allopurinol 300 mg once daily with an end date of March 31, 2018, but was listed as a "no show" on October 4, 9, 12, 20, and 24. R. 333.

On October 5, 2017, Plaintiff submitted a Non-emergency Request Form to inform nursing that "Dr. Moak in Sweetwater" told him that "sandwich meat is bad for [his] gout" and asked that the kitchen be notified that he needs a no beans and no processed meat diet tray. R. 289. The record indicates that the request was approved. *Id.* But the record contains no contemporaneous medical diet order until Nurse Sharon signed one on October 22, 2017, requesting a "no beans - Gout diet." *See* R. 276, 297.

On November 1, 2017, Plaintiff completed a Non-emergency Request Form to request that the nursing department provide his proper diet tray.[9] He claimed that it was his fourth request. Medical staff returned it with the following note: "You are already on a 'No beans/gout diet.' We cannot do no processed meats. You are in jail, we can only do so much. If you cannot eat something on your tray, then do not eat it."

Plaintiff also completed a grievance on November 1, 2017, (received November 2, 2017), explaining that, while he was housed in Nolan County Jail, Dr. Moak increased his Allopurinol prescription to 300 mg and put him on a special medical gout diet. R. 257. Plaintiff requested that he be placed on the proper diet. *Id.* In response to that grievance, Nurse Kris Martin resubmitted his gout diet request on November 2, 2017. R. 285. In a Medical Diet Order dated November 2, 2017, Nurse Martin requested a "Gout diet: No beans, No processed meats, Low purines." R. 275. When addressing the grievance, Nurse Martin explained:

> This inmate was on a "no bean/no processed meat/GOUT" diet prior to leaving to be housed in another county. When he returned, he requested that diet again on a medical non-emergency form on 10/6/17. I approved his diet request on 10/6/17, but have no proof that his diet sheet was ever submitted to dietary. When Mr. Smith next notified us about his [tray] not being in accordance with his requested diet, he spoke with Sharon, RN and she then submitted another diet sheet that same date on 10/22/17 requesting a "no beans-gout diet." I am submitting another diet request tonight for Mr. Smith asking for a "no beans, no preserved meats, GOUT diet" and will ensure that it gets faxed to the kitchen. I am unsure how closely the kitchen can stick to a true Gout diet, but I will make sure they get the request.

R. 259. An undated list showing special diets for the Jail's inmates shows that Plaintiff was started on a "No beans, Gout diet, No processed meats, Low purines" on August 16, 2017, until his release. R. 260. On November 3, 2017, the Jail denied the grievance while explaining:

---

[9]Plaintiff has attached a copy of the front and back of this document to his complaint.

> The proper treatment was provided to you. According to our records you have been given extensive medical care. You have seen a specialist and all orders are being followed.
>
> . . .
>
> Medical has had you on the diet list for some time now. The nursing supervisor is going to get with the kitchen supervisor to see why you are not receiving your diet as requested.

R. 261.[10] A dietician at Aramark Correctional Services sent the Jail a memorandum regarding Plaintiff's requested special diet on November 3, 2017, and provided general guidelines for providing such a diet to an inmate. R. 278-79.

On November 6, 2017, Plaintiff asked to see a doctor for follow-up about his gout and eating processed foods. R. 293. A note indicates that the issue was resolved. *Id.* A medication chart for November 2017, shows that Plaintiff refused both Allopurinol and Ibuprofen on the mornings of November 7 and 10. R. 337. These refusals led to medical note that Plaintiff was non-compliant with medication. R. 340.

Plaintiff completed a grievance on November 15, 2017, (received November 17, 2017), primarily complaining about receiving "raw dough" as part of a meal and also mentioning that he received a substitute meal that contained two sandwiches containing lunchmeat even though he was "on a no processed meat diet." R. 252. An Offender Meal Log shows that Plaintiff accepted two meals on November 15 – one at 11:30 a.m. and another just before 6:00 p.m. R. 254. The Offender Log Report likewise shows acceptance of only those two meals. *See* R. 172-74. On November 27, 2017, after an investigation, the Jail found no merit to the grievance. R. 255-56.

On November 20, 2107, Plaintiff requested and received compression socks for swelling in ankles due to his gout. R. 285, 295-96. The next day, KB referred Plaintiff to Dickinson due to con-

---

[10]Plaintiff provides an unsigned version of this document with his complaint.

stant complaints about swelling and pain caused by gout. R. 285. Medical progress notes of that date show that labs were ordered and, as noted by "SE," Dickinson restarted Plaintiff on Ibuprofen 800 mg. R. 285. Plaintiff requested an evaluation on November 27, 2017, and an unidentified medical person evaluated his gout two days later and prescribed Prednisone and Indomethacin. *Id.* A record from Shannon Medical Center Laboratories dated November 29, 2017, shows a gout diagnosis and Dickinson as the referring physician.[11] R. 286. Laboratory analysis from that date shows uric acid level of 6.1 within the acceptable range of 3.6 to 7.4. R. 284. A chart shows that Dickinson authorized Plaintiff to start new prescriptions on November 30, 2017, for (1) Prednisone with end date of December 5, 2017; and (2) Indomethacin 25mg with end date of December 9, 2017. R. 338.

These facts provide a background for Plaintiff's civil complaint signed on November 21, 2017, and received on November 28, 2017. *See* Compl. (doc. 1) at 1, 5. Plaintiff therein alleges that he was confined in the Tom Green County Jail at all times relevant to his claims, *id.* at 4, but his later submitted time-line of events concedes that he was housed in Nolan County Jail in Sweetwater, Texas, from August 25 through October 2, 2017, *see* Doc. 9. As recited above, the administrative record submitted prior to the *Spears* hearing likewise shows that Plaintiff left Tom Green County Jail on August 25 and returned October 3, 2017. In any event, this case only concerns acts and omissions that occurred at the Tom Green County Jail.

In his Complaint, Plaintiff identifies only two defendants – the Nurse and Tom Green County Jail. After the Court informed him that the Jail appears to be a non-jural entity that is not subject to suit, Plaintiff indicated that he would consider substituting a different defendant for the Jail. He later

---

[11]The record contains a similar medical record from Shannon Medical Center Laboratories, but it is undated, mostly illegible, and not useful to the Court's analysis. *See* R. 288.

stated that he wanted to add Shannon Medical Center as a defendant because it employs the Nurse. In the filing that the Court has construed as a motion to add defendants, Plaintiff reiterates that he wants to add that entity as a defendant and states that he also wants to add the food services provider at the Jail, Aramark, as a defendant.

Plaintiff asserts three claims in this action. In Claim 1, he asserts a claim purportedly under the Eighth Amendment for denial of medical care. With respect to this claim, he alleges that between July 17, 2017, and November 3, 2017,[12] the Nurse denied him proper medication and a proper diet for his known gout problem. The gist of this claim, as stated at the evidentiary hearing, is that new tests and evaluations were not performed until he went to Nolan County where he was prescribed 300 mg Allopurinol for active gout instead of the 100 mg administered at Tom Green County Jail. He alleges that the Nurse failed to check his file and did not perform blood work or ask questions. Instead, she simply restarted medications from his prior incarceration and ordered a no beans diet. He also received pain medication in addition to Allopurinol for his gout.

In his time-line he alleges that he was sent to Nolan County during a gout flare-up on August 25, 2017, but was unable to receive anything until seen by medical, ten to fourteen days later. He further alleges that he experienced another flare-up on August 27, 2017, which made him unable to walk without assistance. He alleges that once he was seen by medical at Nolan County, they "simply followed orders from Tom Green County Medical Staff" with respect to medications and diet tray. He also alleges that he had another flare-up on September 15, 2017, which forced him to use a wheelchair. About ten days later, Nolan County had an outside physician (Dr. Moak) examine Plaintiff and review his charts. According to Plaintiff, Dr. Moak was disturbed to find that Plaintiff

---

[12]At the *Spears* hearing, Plaintiff stated that the denial of proper medications lasted through mid-October, 2017.

"was only prescribed and given 100 mg Allopurinol" instead of the normal dosage for "active gout," 300 mg. Doc. 9 at 1. Dr. Moak increased Plaintiff's dosage to 300 mg, reviewed Plaintiff's diet chart, and found it inadequate for gout patients because it only listed beans as prohibited, when it should also prohibit processed meats and purine. *Id.* at 1-2. Plaintiff experienced improvement under the care of Dr. Moak.

In the time-line, Plaintiff also alleges that when he returned to Tom Green County Jail on October 3, 2017, he had his new medication and told the "nurse on call about meds and diet tray, but Nurse Chelsea told him "no meds found and that Nurse Sharon said she was not going to request no process meats because that's all the kitchen serves and they will be mad." *Id.* at 2. Plaintiff later asked Nurse Sharon why she has not and will not send the special diet to the kitchen and she rolled her eyes and said that she would "try to remember to do it today." *Id.* Plaintiff then told her to write it down and she told him "to stop being a bitch" and stated "transgenders are such fucking drama queens." *Id.* The next day, Nurse Chelsea advised him to file a grievance because Nurse Sharon did not submit the diet and would not do so. *Id.*

With respect to the diet aspect of this claim, Plaintiff alleges that the Nurse did not provide a chart to the kitchen. He states that, at first, the denial of proper diet was negligent, but it became intentional when she stated "I won't do that." The filed time-line states that Plaintiff received beans that he cannot consume on November 10, 14, 15, and 16, 2017; beans and purine on November 22 and 30, 2017; beans in most of December 2017; beans five times in January 2018; and processed meats more than ten times on unspecified dates. At the *Spears* hearing, Plaintiff affirmed that his time-line provides an accurate summary of when he alleges that he was denied a proper diet. He also stated that, generally, at least one meal a day contained food that he cannot eat thus causing him to

often trade other inmates for food he can eat. He explained that purine is seasoning that aggravates his gout by increasing his uric acid and that the Nurse ignored the diet chart and refused requests to notify kitchen of restrictions. He identified a specific incident on or about October 21, 2017.

Plaintiff identifies the following physical injuries caused by the denial of proper medication and diet: (1) inflexible ankles and feet, (2) could not walk due to knee, and (3) gout, i.e., uric crystal build up. He states that the symptoms abated but he sustained "permanent damage from being ground down."

In Claim 2, which he describes as harassment with homosexual discrimination, he alleges that, on August 25, 2017,[13] the Nurse harassed him by gender stereotyping in deliberate indifference to his sexuality. He explains that after he spent two weeks sleeping on the floor and requested medical attention, the Nurse rudely responded: "You transgenders are drama queens." He stated at the *Spears* hearing that this was the "only rude time," but there were other more subtle occurrences. He believes that her prejudice toward homosexual inmates and general lack of regard for others led to her bad treatment of him.

In Claim 3, he alleges that the Nurse committed medical malpractice by not following a prior doctor's order regarding medications. He alleges that she knew of the prior orders about the diet tray and 100 to 300 mg Allopurinol, because they were written in his file. He claims the Nurse stated: "I read it, all we have is processed meat, I'm not gonna do that. If you can't eat it, don't eat it."

In his complaint, Plaintiff seeks injunctive relief and punitive, actual, and exemplary damages, including mental anguish for pain and suffering. At the *Spears* hearing, he abandoned the

---

[13]This date differs than the date mentioned in Plaintiff's time-line, but the precise date does not matter significantly for purposes of this order.

request for injunctive relief. He stated that he seeks actual damages because he is limp, sore, cannot exercise, and has permanent effects from the gout. He seeks exemplary or punitive damages because he has had no doctor visit regarding long-term effects since seeing Dr. Moak.

Given these facts and background information, the Court now conducts the preliminary screening of this action as contemplated by 28 U.S.C. §§ 1915(e)(2) and 1915A.

## II.    SCREENING

Plaintiff proceeds with this case *in forma pauperis*. Therefore, this action is subject to *sua sponte* dismissal under 28 U.S.C. § 1915(e)(2)(B). In addition because he is a prisoner seeking redress from governmental entity or an officer or employee of such an entity, his complaint is subject to preliminary screening pursuant to 28 U.S.C. § 1915A regardless of whether he proceeds *in forma pauperis*. *See Martin v. Scott*, 156 F.3d 578, 579-80 (5th Cir. 1998) (per curiam). Both statutes provide for *sua sponte* dismissal of the complaint, or any portion thereof, if the Court finds it is frivolous or malicious, if it fails to state a claim upon which relief may be granted, or if it seeks monetary relief against a defendant who is immune from such relief. *See* 28 U.S.C. §§ 1915(e)(2)(B), 1915A(b).

The Court may find a claim frivolous when it "lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). A claim lacks an arguable basis in law, furthermore, when it is "based on an indisputably meritless legal theory." *Id.* at 327. A claim lacks an arguable basis in fact, when it describes "fantastic or delusional scenarios." *Id.* at 327-28. A complaint fails to state a claim upon which relief may be granted, on the other hand, when it fails to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted).

"[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the alleged] facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (citation omitted). A plaintiff, however, must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555; *accord Iqbal*, 556 U.S. at 678 (emphasizing that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions"). Alleged facts must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The alleged facts must "nudge" an asserted claim "across the line from conceivable to plausible" to avoid summary dismissal. *Id.* at 570.

In this case, Plaintiff brings three claims against two defendants and seeks to add two new defendants.

## A. Jural Entity

Plaintiff originally brought this action against the Tom Green County Jail and the Nurse. Because courts should alert plaintiffs who proceed without counsel and provide them an opportunity to amend when they name a non-jural entity as a defendant, *see Parker v. Fort Worth Police Dep't*, 980 F.2d 1023, 1026 (5th Cir. 1993), the Court informed Plaintiff that the Jail appeared to be a non-jural entity that is not subject to suit. In response, Plaintiff indicated that he may name a different defendant and ultimately did name Shannon Medical Center as a defendant in addition to moving

to add that entity and another entity as defendants. Consequently, it appears that Plaintiff has abandoned his claims against the Jail.

Nevertheless, in an abundance of caution, the Court treats the Jail as remaining in this case at this time. To the extent Plaintiff continues to sue the Jail, he "seeks recovery from a legal entity that does not exist for his purposes." *See Darby v. Pasadena Police Dep't*, 939 F.2d 311, 314 (5th Cir. 1991). To sue "a servient political agency or department," the agency or department must enjoy "a separate and distinct legal existence." *Seale v. Dallas Cnty.*, No. 3:15-CV-3981-L, 2016 WL 3211789, at *2 (N.D. Tex. May 5, 2016) (recommendation of Mag. J. addressing Dallas County Jail), *accepted by* 2016 WL 3166792 (N.D. Tex. June 7, 2016). Absent "explicit steps . . . to grant the servient agency with jural authority" by "the true political entity," a governmental agency or department "cannot engage in any litigation except in concert with the government itself." *Darby*, 939 F.2d at 313.

In general, a county jail is not a jural entity that is subject to suit. *Tello v. Eastland Cnty. Jail*, No. 1:17-CV-105-BL, 2018 WL 3543698, at *2 (N.D. Tex. July 23, 2018); *Howell v. Jones Cnty. Jail*, No. 1:16-CV-0025-BL, 2017 WL 2399337, at *3 (N.D. Tex. June 1, 2017). This case presents no basis to find that the Tom Green County Jail has a separate legal existence and is subject to suit. Because the county jail lacks jural authority, any claims against it must be dismissed as frivolous.

## B. Claims against Nurse

Plaintiff asserts three claims against Nurse Sharon: (1) deprivation of medical care and proper diet; (2) harassment with homosexual discrimination; and (3) medical malpractice.

1. **Deprivation of Medical Care and Proper Diet**

Plaintiff claims that the Nurse denied him proper medical care and medical diet in violation of the Eighth Amendment. He asserts a claim based on episodic acts or omissions, not on general jail conditions or practices. Because Plaintiff was a pretrial detainee during the relevant period, this claim invokes consideration of the Fourteenth Amendment rather than the Eighth Amendment. Regardless, the same deliberate indifference standard governs claimed denials of medical care whether brought by a convicted inmate under the Eighth Amendment or by a pretrial detainee under the Fourteenth Amendment. *See Hare v. City of Corinth*, 74 F.3d 633, 639, 643, 647-48 (5th Cir. 1996) (en banc). The Fifth Circuit "has recognized that there is no significant distinction between pretrial detainees and convicted inmates concerning basic human needs such as medical care." *Gibbs v. Grimmette*, 254 F.3d 545, 548 (5th Cir. 2001).

In the deprivation-of-medical-care context, prison officials violate the Constitution "only when two requirements are met." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (Eighth Amendment); *accord Hare*, 74 F.3d at 647-48 (applying *Farmer* in context of Fourteenth Amendment). When plaintiffs premise a medical deprivation claim on episodic acts or omissions, the courts consider (1) whether the alleged deprivation is "objectively, 'sufficiently serious'" such that the act or omission results "in the denial of 'the minimal civilized measure of life's necessities'" and (2) whether the official had a "sufficiently culpable state of mind" in acting or failing to act. *Farmer*, 511 U.S. at 834. In other words, a prison "official's liability for episodic acts or omissions cannot attach unless the official had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk." *Hare*, 74 F.3d at 650; *accord Gobert v. Caldwell*, 463 F.3d 339, 345-46 (5th Cir. 2006). Both of these inquires are fact intensive.

*Garrett v. Thaler*, 560 F. App'x 375, 380 n.3 (5th Cir. 2014) (per curiam).

Prison officials are deliberately indifferent only when they know of the substantial risk of serious harm faced by the inmate and "disregards that risk by failing to take reasonable measures to abate it." *Gobert*, 463 F.3d at 346 (quoting *Farmer*, 511 U.S. at, 834). "Deliberate indifference is an extremely high standard to meet." *Sanchez v. Young Cnty.*, 866 F.3d 274, 280 (5th Cir. 2017). As a matter of law, prison officials are not deliberately indifferent merely because they provide "[u]nsuccessful medical treatment," act negligently, or commit medical malpractice. *Gobert*, 463 F.3d at 346. Absent exceptional circumstances, furthermore, "a prisoner's disagreement with his medical treatment" does not constitute deliberate indifference. *Id.* Additionally, pursuit of further treatment or additional diagnostic techniques are matters of medical judgment that do not constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 107 (1976). Such matters of medical judgment also do not violate the Fourteenth Amendment.

"Deliberate indifference will often be a fact-laden question" which makes it difficult for the courts "to draw bright lines in such an inquiry." *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 457 (5th Cir. 1994). Nevertheless, deliberate indifference requires that the acts or failures to act of the prison officials constitute refusing to treat the prisoner, ignoring his complaints, intentionally treating the prisoner incorrectly, or engaging "in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Gobert*, 463 F.3d at 346 (citation and internal quotation marks omitted). Courts appropriately dismiss constitutional claims as frivolous or for failure to state a claim when medical records contradict a claim of deliberate indifference or when the prisoner "alleges that medical personnel should have attempted different diagnostic measures or alternative methods of treatment." *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997). Medical personnel

are not deliberately indifferent, as a matter of law, when medical records show that the officials provided extensive medical care even when the inmate has a history of complaints and physicians had refused "to accommodate his requests in the manner he desired." *Brauner v. Coody*, 793 F.3d 493, 500 (5th Cir. 2015) (addressing issues at summary judgment stage).

Courts look at the circumstances as a whole when considering whether a prison official knows of a substantial risk of serious harm and responded with deliberate indifference. In this case, Plaintiff has a medical condition (gout) that fluctuates between periods of seeming remission and periods of extreme pain. The condition is affected by increased uric acid levels, which can be controlled, at least to some extent, with medication and diet. Prescribed medical treatment varies depending on whether Plaintiff is experiencing a flare-up or acute gout attack or whether the condition is under control. At times, treatment is merely for purposes of preventing such a flare-up and maintaining low uric acid levels, but during a gout attack, treatment is intended to regain control over the condition and eliminate the attack. Given the fluctuations of this type of condition, a generalized knowledge that an inmate has gout may be sufficient to require a basic level of treatment, but not more specific treatment that is needed when an acute attack arises.

Similarly, an inmate's own actions may affect whether a given prison official responds with deliberate indifference to a known risk of serious harm. In general, prison officials may appropriately consider whether an inmate is actively seeking increased medication or treatment or is instead non-compliant with prescribed medication, refuses medication or other treatment, or otherwise engages in conduct which indicates that the inmate himself does not view a medical condition as serious or as requiring additional or different treatment. Such considerations may take on more importance for a medical condition like gout, which flares up from time to time and thus may require

an increased dosage of medication or other medical treatment.

Plaintiff purportedly bases his claims on acts and omissions occurring between his return to Tom Green County Jail on July 17, 2017, and November 3, 2017, but it is clear from his time-line of events and the administrative record that he actually complains about two distinct periods of time that are divided by time he spent in Nolan County Jail. The first period runs from July 17 through August 25, 2017. The second runs from October 3 to November 3, 2017.[14] His detention at Nolan County is not at issue in this case, although it does provide insightful information regarding matters that are at issue.

Additionally, Plaintiff premises his denial-of-medical-care claim on two distinct alleged denials: (1) proper medication dosage and (2) proper medical diet. The facts of this case undoubtedly show that Plaintiff disagrees with the medical treatment received with respect to his gout medication and diet while housed at the Jail. But "such disagreement does not state a claim for deliberate indifference to his medical needs." *Tidwell v. Fortner*, 61 F. App'x 917, 917 (5th Cir. 2003) (per curiam) (citing *Norton*, 122 F.3d at 292 and affirming screening dismissal).

Furthermore, records provided to the Court show that medical personnel provided extensive medical care to Plaintiff. Within two days of his arrival at the Jail on July 17, 2017, medical staff examined Plaintiff and prescribed medication. While Plaintiff complains that Nurse Sharon did no testing and asked no questions, he provides no factual basis for her to do so at that time. As Plaintiff conceded at the *Spears* hearing, Nurse Sharon restarted his medications from his prior detention at Tom Green County Jail and ordered a no beans diet. The administrative record likewise shows that

---

[14]Plaintiff includes information regarding dates after November 3, 2017, but his complaint is limited to that date. Nevertheless, even if the Court were to consider his claims as continuing through the date of the *Spears* hearing, the Court's ultimate rulings on his claims would remain the same.

medical staff placed Plaintiff on Allopurinol 100 mg within four days of his arrival in July 2017 and this dose was increased to 300 mg when he returned to the Jail on October 3, 2017. Jail records also show that KB directed a "no beans" diet to start August 9, 2017, while another jail record shows that, as of August 16, 2017, Plaintiff was on a low purine and no beans or processed meats diet. Although a similar diet was approved on October 6, 2017, the record only reflects that Nurse Sharon requested a no beans, gout diet on October 22, 2017, and Nurse Martin submitted a diet order on November 2, 2017, for low purine and no beans or processed meats.

Given the distinct aspects of Plaintiff's denial-of-medical-care claim, the Court considers them separately. Because Plaintiff contends that the proper medication dosage for Allopurinol is 300 mg, he has no claim for the second part of his detention in the Tom Green County Jail. When he returned to the Jail, medical personnel discontinued the lower dose and prescribed and administered the increased dosage. Thus, with respect to the proper medication dosage, Plaintiff's claim essentially boils down to his receipt of only 100 mg from July 17 to his transfer to Nolan County on August 25, 2017. But Plaintiff alleges no facts to support finding that Nurse Sharon deprived him of proper medical care by prescribing and administering Allopurinol 100 mg in July and August 2017. A medical record specifically notes that he was in no current need for medical attention when he arrived at the Jail on July 2017. Medical records for July and August 2017 show that Plaintiff was non-compliant with or skipping medication. In late July and early August 2017, Plaintiff did inquire about his diet tray and requested a follow-up regarding his gout. He did not indicate a need for any increased medication dose at that time. Medical responded with faxing a gout diet to the kitchen. The facts alleged, as supplemented by the verified medical records, do not satisfy the extremely high standard for deliberate indifference. That Dr. Moak prescribed a higher dose of medication while

Plaintiff was housed in Nolan County merely shows a difference in medical opinion or changed circumstances, i.e., an active gout flare-up, that warranted an increased dose. With respect to the medication dosage prescribed for Plaintiff, the Court cannot find on the facts alleged that Nurse Sharon refused to treat Plaintiff, ignored his medical complaints, intentionally treated him incorrectly, or engaged in any similar conduct that clearly evinces a wanton disregard for a serious medical need.

Although the alleged denial of proper medical diet differs slightly because there is less certainty with respect to what diet was ordered and when it was forwarded to the kitchen, the outcome remains the same. Plaintiff only sues Nurse Sharon for his alleged improper diet. The record does not support finding her involved with his diet until October 2017. Plaintiff even characterizes her conduct as negligent until she said "I won't do that." Any such statement did not occur until after Plaintiff returned from Nolan County. Moreover, Plaintiff concedes that a medical diet was restarted when he returned to the Jail upon his arrest in July 2017. In addition, the record shows that varying diets were ordered throughout his latest detention at the Tom Green County Jail. For the most part, it appears that the diet aspect of his claim is simply a disagreement with the specific diet ordered based upon the diet ordered by Dr. Moak. In any event, the differing diets do not appear to result from Nurse Sharon refusing to provide a gout diet, ignoring his gout complaints, intentionally treating him incorrectly, or engaging in any similar conduct that clearly evinces a wanton disregard for a serious medical need. From the facts alleged, it does not appear that medical personnel at the Jail acted or failed to act with deliberate indifference to Plaintiff's medical condition by the medical diets ordered.

While there may have been some delay in a diet being forwarded to the kitchen, no delay

seems attributable to Nurse Sharon until October 2017, when she told Plaintiff she would not forward a no processed meats diet to the kitchen. However, even with that statement, Nurse Sharon did forward a medical diet to the kitchen and other medical personnel had specifically forwarded various diets to the kitchen, including a no processed meat diet. Regardless, delayed medical treatment, or in this case a delayed medical diet, can only constitute a constitutional "violation if there has been deliberate indifference, which results in substantial harm." *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993). Even if the Court were to accept that Nurse Sharon reacted with deliberate indifference when Plaintiff wanted her to forward a no processed meat diet to the kitchen, Plaintiff has alleged no facts indicating that any delay caused by Nurse Sharon substantially harmed him or exacerbated his gout. Accordingly, the alleged delay does not rise to the level of a constitutional violation. *See Atkins v. Sheriff's Jail Avoyelles Par.*, 278 F. App'x 438, 439 (5th Cir. 2008) (per curiam).

For all of these reasons, Plaintiff's denial-of-medical-care claim fails to state a claim upon which relief can be granted.

## 2. Harassment with Homosexual Discrimination

Plaintiff also seeks monetary damages based on a claim that the Nurse harassed him with homosexual discrimination. He describes the claim alternatively as harassment, homosexual discrimination, and gender stereotyping in deliberate indifference. Regardless of the description, he bases it on an isolated statement that transgenders are drama queens along with other subtle comments that he does not identify.

Plaintiff's alleged harassment or discrimination sounds in equal protection, but to succeed on such claim under 42 U.S.C. § 1983, the "plaintiff must allege a state actor intentionally discrim-

inated against him because he was a member of a protected class." *James v. Hertzog*, 415 F. App'x

530, 532 (5th Cir. 2011) (per curiam) (citing *Williams v. Bramer*, 180 F.3d 699, 705 (5th Cir. 1999)).

To prevail on a claim that the Nurse violated his right to equal protection by discriminating against

him or harassing him due to his sexual orientation, "plaintiff must allege facts which, if proved, dem-

onstrate that 'he received treatment different from that received by similarly-situated individuals and

that the unequal treatment stemmed from discriminatory intent.'" *Praylor v. Partridge*, No. 7:03-

CV-247-BD, 2005 WL 1528690, at \*3 (N.D. Tex. June 28, 2005) (quoting *Priester v. Lowndes*

*Cnty.*, 354 F.3d 414, 424 (5th Cir. 2004)). "The plaintiff must demonstrate that a defendant acted

with a 'discriminatory purpose'" *Hines v. Graham*, 320 F. Supp. 2d 511, 522 (N.D. Tex. 2004)

(quoting *Woods v. Edwards*, 51 F.3d 577, 580 (5th Cir. 1995)). To act with such purpose "in an

equal protection context implies that the decisionmaker selected a particular course of action at least

in part because of, and not simply in spite of, the adverse impact it would have on an identifiable

group." *United States v. Galloway*, 951 F.2d 64, 65 (5th Cir. 1992) (cited with approval in § 1983

context in *Hines*).

In this case, Plaintiff does not allege that the Nurse intentionally discriminated against him

because of his sexual orientation. Nor has he alleged that he received treatment different from other

inmates who do not share his sexual orientation. His testimony at the *Spears* hearing that he believes

the Nurse's prejudice toward homosexual inmates and general lack of regard for others led to her bad

treatment simply does not allege facts sufficient to succeed on an equal protection claim against the

Nurse.

Furthermore, "complaints of verbal harassment or threats, unaccompanied by any physical

abuse, do not give rise to a claim for relief under § 1983," even if described as "harassment."

*Lowrey v. Beach*, No. 2:15-CV-0301, 2016 WL 10951280, at *4 (N.D. Tex. Sept. 1, 2016). Words alone simply do not amount to a constitutional violation and thus relief under § 1983 is not available. *See McFadden v. Lucas*, 713 F.2d 143, 146 (5th Cir. 1983). "Verbal harassment, without more, does not amount to a constitutional violation." *Ali v. Immigr. & Customs Enf't*, No. 1:16-CV-037-BL, 2017 WL 4325785, at *7 (N.D. Tex. Aug. 29, 2017) (recommendation of Mag. J.) (citing *Bender v. Brumley*, 1 F.3d 271, 274 n.4 (5th Cir. 1993)) *adopted by* No. 1:16-CV-037-C, 2017 WL 4296756 (N.D. Tex. Sept. 26, 2017). Because Plaintiff does not provide any facts that he suffered any harm as a result of the claimed discriminatory remark about his sexual orientation, the remark provides an insufficient basis for the Court to find a constitutional violation. *See id.*

In addition, 42 U.S.C. § 1997e(e) places the following limitation on recovery for prisoner cases: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of Title 18)." Consequently, without a physical injury from the alleged harassment, Plaintiff cannot recover for mental or emotional injuries.

For all of these reasons, Plaintiff's claim regarding his sexual orientation fails to state a claim upon which relief can be granted.

### 3. Medical Malpractice

In his complaint, Plaintiff asserts a claim of medical malpractice based upon the alleged lack of proper medical care and diet. This type of claim is merely a tort claim for negligence that is not cognizable in an action under 42 U.S.C. § 1983. *See Daniels v. Williams*, 474 U.S. 327, 329-30 (1986); *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006); *Eason v. Thaler*, 73 F.3d 1322, 1329

n.3 (5th Cir. 1996). "Instead, negligence is a tort under state law, and the Supreme Court has held that the Fourteenth Amendment is not a font of tort law to be superimposed upon whatever systems may already be administered by the states." *Rose v. Sherman*, No. 5:12-CV-239-C, 2015 WL 13261882, at *5 (N.D. Tex. Apr. 16, 2015) (citing *Paul v. Davis*, 424 U.S. 693, 711 (1976)), *aff'd*, 676 F. App'x 258 (5th Cir. 2017).

The Texas Tort Claims Act ("TTCA") is the exclusive means to bring suit against Texas and its municipalities for common-law torts of their employees. *Franka v. Velasquez*, 332 S.W.3d 367, 369 (Tex. 2011); *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 659 (Tex. 2008). "The TTCA 'creates a limited waiver of sovereign immunity.'" *Goodman v. Harris Cnty.*, 571 F.3d 388, 394 (5th Cir. 2009) (quoting *Johnson v. Waters*, 317 F. Supp. 2d 726, 738 (E.D. Tex. 2004)). "In certain circumstances, the TTCA waives the immunity that would otherwise bar suit against a governmental unit and an employee sued in his official capacity." *Molina v. Alvarado*, 463 S.W.3d 867, 870 (Tex. 2015). Nevertheless, "the TTCA's election-of-remedies provision, section 101.106, effectively conditions the immunity waiver on the plaintiff's forfeiture of any negligence claims against the employee in his individual capacity." *Id.* Section 101.106 "encourages, and in effect mandates, plaintiffs to pursue lawsuits against governmental units rather than their employees when the suit is based on the employee's conduct within the scope of employment." *Tex. Adjutant Gen.'s Office v. Ngakoue*, 408 S.W.3d 350, 352 (Tex. 2013).

Here, Plaintiff does not sue the governmental entity or any employee in their official capacity. He instead sues a nurse and the Jail while also seeking to add Shannon Medical Center and Aramark as defendants. He seeks to hold the Nurse individually liable for alleged acts and omissions taken within the scope of her employment at the Jail. However, a plaintiff may not sue an individual

"under the TTCA as the act 'does not govern suits brought directly against an employee of the State.'" *Goodman*, 571 F.3d at 394 (quoting *Huntsberry v. Lynaugh*, 807 S.W.2d 16, 17 (Tex. App. – Tyler 1991, no writ)). Given the facts alleged, Plaintiff's negligence claim against the Nurse in her individual capacity has no arguable basis in law and is thus frivolous.

In addition, had Plaintiff brought suit under the TTCA "against both a governmental unit and any of its employees," the employee would have been subject to immediate dismissal on motion of the governmental unit. Tex. Civ. Prac. & Rem. Code Ann. § 101.106(e) (West 2011). Furthermore, although the TTCA does not permit suits against employees of a governmental unit in their individual capacity, it does contemplate official capacity suits against such employees and provides a means for the employee to obtain dismissal of the suit if the plaintiff does not amend the complaint to name the governmental unit. *See id.* § 101.106(f). Section 101.106(f) provides:

> If a suit is filed against an employee of a governmental unit based on conduct within the general scope of that employee's employment and if it could have been brought under this chapter against the governmental unit, the suit is considered to be against the employee in the employee's official capacity only. On the employee's motion, the suit against the employee shall be dismissed unless the plaintiff files amended pleadings dismissing the employee and naming the governmental unit as defendant on or before the 30th day after the date the motion is filed.

The intent behind § 101.106(f) is to "force a plaintiff to decide at the outset whether an employee acted independently and is thus solely liable, or acted within the general scope of his or her employment such that the governmental unit is vicariously liable." *Ngakoue*, 408 S.W.3d at 354-55 (quoting *Garcia*, 253 S.W.3d at 657). Further, § 101.106(f) is intended "to ensure that tort claims within the purview of the Act do not proceed against a government employee for conduct within the scope of his employment." *Tex. Dep't of Aging & Disability Servs. v. Cannon*, 453 S.W.3d 411, 418 (Tex. 2015).

While the TTCA contemplates official capacity claims against an employee, Plaintiff does not sue the Nurse in her official capacity for the alleged medical malpractice. Nor is there a legal basis to do so in federal court. Such an official capacity claim is essentially a claim against the governmental unit, and "although the State of Texas has waived its sovereign immunity to the extent of liability created by the TTCA, Texas has waived 'sovereign immunity in state court only.'" *Smithback v. Texas*, No. 3:07-CV-0288-M, 2007 WL 1518971, at *16 (N.D. Tex. May 24, 2007) (accepting recommendation of Mag. J. quoting *Sherwinski v. Peterson*, 98 F.3d 849, 852 (5th Cir.1996)). In Texas, suits under the TTCA "shall be brought in state court in the county in which the cause of action or a part of the cause of action arises." Tex. Civ. Prac. & Rem. Code Ann. § 101.102(a) (West 2011). "A state's constitutional interest in immunity encompasses not merely *whether* it may be sued, but *where* it may be sued." *Sherwinski*, 98 F.3d at 852 (quoting *Welch v. Dep't of Highways & Pub. Transp.*, 483 U.S. 468, 473 (1987)). As the Supreme Court has emphatically stated: "a state's consent to SUIT IN ITS OWN COURTS IS NOT A waiver of its immunity from suit in federal court." *Sossamon v. Texas*, 563 U.S. 277, 285 (2011). Consequently, Plaintiff has no legal basis under the TTCA to sue the Nurse in her official capacity in federal court.

For all of these reasons, Plaintiff's medical malpractice claim has no legal basis for bringing it against the Nurse in this Court. The claim is thus frivolous.

## C. New Defendants

At the *Spears* hearing, Plaintiff added Shannon Medical Center as a defendant in this action. In his later filing that has been construed as a motion to add parties, he seeks to add that entity and Aramark as defendants. He seeks to hold the medical center vicariously liable for acts of its alleged employee, Nurse Sharon. With respect to Aramark, he merely states that he wants to add it as the

food service provider at the Jail.

The Court denies the motion to add parties. First, the motion is unnecessary with respect to the medical center. Plaintiff adequately added that entity as a defendant at the *Spears* hearing. Second, Plaintiff has not complied with the local rules of this Court that govern motions to amend. "When a party files a motion for leave to file an amended pleading that, if leave is granted, will be filed on paper, the party must attach a copy of the proposed amended pleading as an exhibit to the motion." N.D. Tex. L.R. 15.1(a). Plaintiff has not complied with this requirement. This failure provides an adequate reason not to add Aramark as a defendant. However, even without that procedural failure, Plaintiff has provided no factual or legal basis to add Aramark as a defendant in this action. To the extent Plaintiff seeks to sue that entity under a theory of vicarious or respondeat superior liability, 42 U.S.C. § 1983 creates no means for such liability. *See Rios v. City of Del Rio*, 444 F.3d 417, 425 (5th Cir. 2006); *Oliver v. Scott*, 276 F.3d 736, 742 (5th Cir. 2002). Furthermore, to the extent Plaintiff may be seeking to sue Aramark directly, he simply provides no additional facts or basis to sue the food services provider. Without a viable allegation that the entity itself violated his rights, Plaintiff has stated no claim upon which relief can be granted against the entity. *See Triplett v. Banks*, No. 1:17-CV-65-LG-RHW, 2017 WL 3298683, at *3 (S.D. Miss. Aug. 2, 2017), *reconsideration denied*, 2017 WL 4364415 (S.D. Miss. Sept. 29, 2017); *Stone v. Gusman*, No. CV-16-1321, 2017 WL 3037632, at *3 (E.D. La. June 21, 2017) (recommendation of Mag. J.) *adopted by* 2017 WL 3034362 (E.D. La. July 18, 2017). Plaintiff has provided no legitimate reason to permit him to add Aramark as a defendant in this action.

Because Plaintiff adequately named Shannon Medical Center as a defendant at the *Spears* hearing, his post-hearing request to add the entity does not matter. Nevertheless, he has stated no

claim upon which relief can be granted against this entity. He has asserted no viable claim against Shannon Medical Center because he merely seeks to hold it vicariously liable for the acts or omissions of an alleged employee, Nurse Sharon. As stated above, such liability is unavailable under § 1983. Consequently, the Court finds the asserted claim against Shannon Medical Center frivolous.

## III. LEAVE TO AMEND

In general, courts should provide pro se litigants an opportunity to amend before dismissing a complaint. *See Brewster v. Dretke*, 587 F.3d 764, 768 (5th Cir. 2009). Leave to amend is not required, however, when plaintiffs have already pled their "best case." *Id.* Whether to grant leave to amend is within the Court's sound discretion. *U.S. ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 387 (5th Cir. 2003). In this instance, the Court provided Plaintiff an opportunity to factually support his claims at the *Spears* hearing. In addition, Plaintiff has provided and the Court has considered additional documentation to support his claims. The Court has also considered the administrative record provided by the Jail and Plaintiff's request to add defendants. Accordingly, the Court finds that Plaintiff has pled his best case and that there is no basis to permit any further amendment.

## IV. CONCLUSION

After considering Plaintiff's complaint, his answers at the *Spears* hearing, supplemental filings, the authenticated jail records, and the applicable law, the Court **DISMISSES** this action pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A as frivolous or for Plaintiff's failure to state a claim upon which relief may be granted. This dismissal will count as a "strike" or "prior occasion"

within the meaning of 28 U.S.C. § 1915(g).[15]  For the reasons stated in this Memorandum Opinion and Order, the Court also **DENIES** the filing that has been construed as a motion to add defendants (doc. 11).

**IT IS SO ORDERED** this ___ day of August, 2018.

E. SCOTT FROST
**UNITED STATES MAGISTRATE JUDGE**

---

[15]Section 1915(g) is often referred to as the "three-strikes" provision and provides:

> In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section, if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.